The Glidden Company, Appellee, *v.* Lumbermens Mutual Casualty Company et al., Appellants.

[Cite as *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553.]

(No. 2005–0293—Submitted December 14, 2005—Decided December 20, 2006.)

O'Connor, J.

{¶ 1} This is a discretionary appeal accepted as a case of great general interest pursuant to S.Ct.Prac.R. II(1)(A)(3). Appellants Lumbermens Mutual Casualty Company ("Lumbermens"), American Motorists Insurance Company ("AMICO"), Hartford Accident & Indemnity Company ("Hartford"), Century Indemnity Company ("Century," as successor to INA), Certain Underwriters at Lloyd's, London, and London Market Insurance Companies (collectively, "London"), are putative insurers of appellee, the Glidden Company ("Glidden III"). We are asked to resolve the question of whether insurance coverage arises for Glidden III under commercial general liability policies issued by the appellants. For the reasons that follow, we hold that no coverage arose either by operation of law or by contract. Further, the appellants did not waive and were not collaterally or equitably estopped from offering the corporate-history defense that prevails here.

### Facts and Procedural History

{¶ 2} On June 2, 2000, Glidden III filed suit seeking a declaratory judgment that the appellants are required to defend and indemnify Glidden III against a number of underlying lead-based paint actions that were first filed in 1987. These actions sought damages for injury from the manufacture and sale of lead paints from the 1960s to 1974. Glidden III came into existence in 1986 after a long history of corporate mergers.

{¶ 3} Glidden III claims that the insurance companies sold "occurrence" policies to companies no longer in existence and that therefore the insurance companies should defend Glidden III against claims made against it for those occurrences. The insurance companies assert that insurance contracts between them and the named insureds prohibited the transfer of rights under the policies and that they never issued contracts for insurance to Glidden III.

### The Corporate History

{¶ 4} The court of appeals relied on the statement of facts contained in the trial court's grant of summary judgment in favor of the appellants. We reproduce it below as the primary source of the record in this matter:

{¶ 5} "A. Undisputed Corporate History and Relevant Facts

{¶ 6} "1. Pre-1987 Background

{¶ 7} "The original SCM Corporation (SCM (NY)) was a New York corporation from 1924 to 1986. SCM is the sobriquet for Smith/Corona/Marchant. SCM (NY) is a named insured on the CGL policies at issue covering the period from April 1, 1967 to January 1, 1987.

{¶ 8} "The original 'The Glidden Company' ('Glidden I') was an Ohio corporation with its principal place of business in Cleveland, Ohio from 1917 to 1967. Glidden I was a manufacturer and seller of lead based paints and lead pigments used in paints. Glidden I was insured by London for property damage (1959–1967). Glidden I merged into SCM (NY) on September 22, 1967, which succeeded to the London policies previously issued to Glidden I. The former business operations of Glidden I were carried on through SCM (NY)'s subsidiaries or divisions. Thus, in 1968 Glidden I's acquired paint business became part of SCM (NY)'s Glidden–Durkee Division until 1976 when it was transferred to the Coatings & Resins Division, where it remained until 1986. In 1976, the former pigments part of the business was placed in the Chemical/Metallurgical Division of SCM (NY) where it remained until 1985. On September 6, 1985, SCM (NY) incorporated ABC Chemicals, Inc. as a wholly owned subsidiary and transferred to it the assets of the domestic pigments business.

{¶ 9} "Glidden I was a named insured on certain London policies for the period from 1959 to September 22, 1967 when it merged into SCM (NY). Upon the

merger the London policy was endorsed to change the named insured to the Glidden–Durkee Division of SCM (NY) and coverage continued until January 1, 1970.

{¶ 10} "2. The Hanson Take–Over in 1986 and Sale to ICI

{¶ 11} "In January, 1986 HSCM Industries, Inc., a Delaware corporation and an indirect subsidiary of a British company known as Hanson Trust Plc, acquired control of SCM (NY) by a stock tender offer and implemented a plan of reorganization in order to sell off certain SCM (NY) businesses piece-meal. Thus, in May, 1986 HSCM Industries, Inc. was liquidated and stock ownership of SCM (NY) was transferred to certain indirect subsidiaries of Hanson known as the 'fan companies' (HSCM–1, Inc. through HSCM–20, Inc.).

{¶ 12} "In May, 1986 SCM (NY) adopted a Plan of Liquidation and Dissolution pursuant to which SCM (NY) transferred specified assets and liabilities of its business units to the various fan companies which held its stock. On August 12, 1986, pursuant to the liquidation, SCM (NY) transferred its paints, resins, coatings, caulking and adhesives business (essentially the Coatings & Resins Division) to HSCM–6, Inc. Then on August 14, 1986, Hanson agreed to sell HSCM–6, Inc. to ICI American Holdings, Inc. ('ICI'). On August 22, 1986 HSCM–6 Inc.'s name was changed to The Glidden Company ('Glidden II').

{¶ 13} "The Purchase and Sale Agreement between Hanson and ICI called for a sharing of pre-closing (October 31, 1986) liabilities of the paint business. Hanson and ICI agreed that Hanson would retain ownership of all insurance policies, i.e. including the ones at issue herein. However, a side Letter Agreement of the same date provided that 'Hanson shall give ICI and its subsidiaries the benefit of any policy of insurance to the extent the same would provide cover for liability in respect of occurrences relating to the Business prior to Closing giving rise to loss, injury, or damage thereafter subject to indemnity on costs.'

{¶ 14} "Before the October 31, 1986 closing, ICI assigned its rights under the Purchase and Sale Agreement to two of its wholly owned subsidiaries, Atkemix Seven, Inc. and Atkemix Eight, Inc. On December 30, 1986, Glidden II (formerly named HSCM–6, Inc.) was liquidated and its assets distributed to Atkemix Seven and Atkemix Eight, after which Atkemix Eight was renamed 'The Glidden Company' ('Glidden III'). Glidden III acquired Atkemix Seven (then known as the Macco Company) in 1987.

{¶ 15} "3. SCM (NY) Since the Hanson Take–Over

{¶ 16} "On October 30, 1986 as part of the liquidation and dissolution of SCM (NY), the name of its subsidiary, ABC Chemicals, was changed to SCM Chemicals, Inc. ('SCM Chemicals'). On November 14, 1986, minus the assets and liabilities that had been transferred to the fan companies, SCM (NY) was merged

into HSCM–20, Inc., a Delaware corporation, which was then renamed SCM Corporation ('SCM II'). On November 17, 1986 SCM II was merged into HSCM Holdings, Inc., another Hanson-controlled Delaware corporation, which then was renamed SCM Corporation ('SCM III').

{¶ 17} "On October 14, 1988 SCM III was merged into HM Holdings, Inc., another Hanson-controlled Delaware corporation. Thus SCM Chemicals became a subsidiary of HM Holdings, Inc. Almost eight years later, on September 30, 1996, Hanson sold HM Holdings, Inc.'s indirect parent, Hanson Overseas Holdings Limited, to a newly formed corporation, Millennium Chemicals, Inc. HM Holdings, Inc., the survivor, after merger with Millennium Holdings, Inc. was renamed Millennium Holdings, Inc. SCM Chemicals, which had been a subsidiary of Millennium Holdings, Inc. then changed its name to Millennium Inorganic Chemicals, Inc. in 1997.

{¶ 18} "On June 11, 2001 Millennium Chemicals incorporated a Delaware limited liability company named MHI 2, LLC. Two days later, on June 13, 2001, Millennium Holdings was merged into MHI 2, LLC which was renamed Millennium Holdings LLC, plaintiff herein."

## The Insurance Policies

{¶ 19} Glidden I purchased policies from London covering the period from April 27, 1959, to April 27, 1968. After Glidden I merged into SCM (NY), the existing policy was endorsed to change the named insured to the "Glidden–Durkee Division of SCM Corporation," the division in which Glidden I was placed after the merger.

{¶ 20} SCM (NY) is the named insured on the policies issued by Lumbermens, AMICO, Century, and Hartford, covering April 1, 1967 to January 1, 1987. Glidden III came into existence in 1986. No appellant insurance company has issued a policy to Glidden III.

## Procedural History

{¶ 21} After cross-motions for summary judgment, the trial court denied Glidden III's motion, granted the appellants' motion, and granted final judgment in favor of the appellants. The trial court, in its final order, ruled that collateral estoppel did not apply as the result of litigation in Pennsylvania from 1991 to 1995 between the parties, that Glidden III was not entitled to claim coverage under policies issued to SCM Corporation or any division thereof because it was not a corporate successor to SCM (NY), and that Glidden III was not an insured under any of the policies. It also determined that Ohio law should govern the analysis concerning certain early insurance policies and that New York law should govern the rest because the 1967 merger of Glidden I with SCM (NY) resulted in the relocation of Glidden I's corporate offices and operations to New

York from Ohio. But the court also found that New York law and Ohio law did not diverge on the relevant issues.

{¶ 22} The Eighth District Court of Appeals affirmed in part and reversed in part, despite rendering the judgment "reversed and remanded." The court of appeals determined that collateral estoppel did not prevent the appellants from maintaining their defenses, but that Glidden III was an insured under the appellants' policies by operation of law. The court of appeals also held that Ohio law should apply to allocation of costs for a covered loss. It is this decision that we now reverse, and we hold that Glidden III is not entitled to coverage under any of the policies.

## Analysis

{¶ 23} Appellants seek review of two determinations by the court of appeals. First, they argue that the court made an improper choice of law as to the allocation between the insurers and the decision that coverage arose by operation of law. Second, they argue that the court's determination that insurance coverage arose by operation of law under Ohio law is incorrect.

{¶ 24} We begin by noting that this court decided a nearly identical issue concerning whether insurance coverage arises by operation of law for a subsequent purchaser of corporate assets and liabilities in *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121. In *Pilkington*, we held, "[W]hen a covered occurrence under an insurance policy occurs before liability is transferred to a successor corporation, coverage does not arise by operation of law when the liability was assumed by contract." Id. at ¶ 61. Glidden III has assumed the liabilities in question by contract, so if Ohio law applies, insurance coverage does not arise by operation of law.

{¶ 25} We next turn to appellants' argument that the appeals court erred in not applying New York law.[1] We must begin by noting that several of the appellate courts in Ohio, including those addressing the claims in this case, have held that an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, Cuyahoga App. No. 81782, 2004-Ohio-6922, 2004 WL 2931019, at ¶ 52; *Akro–Plastics v. Drake Industries* (1996), 115 Ohio App.3d 221, 224, 685 N.E.2d 246. The basis of this decision is contained in Restatement of the Law 2d, Conflict of Laws (1972), Section 1, Comment b: "Suppose that A injures B in state Y and B brings suit against A in state X to recover for his injuries. If the local law rules of X and Y differ in relevant respects, the X court may be called

---

1. It is undisputed that for the pre–1967 policies, Ohio law applies.

upon to decide whether to apply the rules of one state rather than the rules of the other." This rule is proper, and we adopt it here.

{¶ 26} Appellants, citing *EM Industries, Inc. v. Birmingham Fire Ins. Co. of Pennsylvania* (1988), 141 A.D.2d 494, 529 N.Y.S.2d 121, assert that New York law rejects the general-operation-of-law theory that insurance coverage follows liability and should thus control. *EM Industries* conducted no operation-of-law analysis, however, and the court concluded abruptly that the insurance coverage did not follow the acquisition of the assets and liability.

{¶ 27} Glidden III counters by suggesting that *Texaco A/S, S.A. v. Commercial Ins. Co. of Newark, N.J.* (S.D.N.Y.1995), No. 90 Civ. 2722, 1995 WL 628997, holds that New York law recognizes that insurance coverage follows claims by operation of law. However, *Texaco A/S* was decided using merger law and was not analyzed as a corporate acquisition/asset sale that involved contractual acceptance of liability. As discussed in *Pilkington*, the distinction is significant, as courts have recognized that situations in which liability is imposed by operation of law may require transference of insurance coverage by operation of law. *Henkel Corp. v. Hartford Acc. & Indemn. Co.* (2003), 29 Cal.4th 934, 941, 129 Cal.Rptr.2d 828, 62 P.3d 69.

{¶ 28} Further review by this court found no cases directly on point as to whether New York would require insurance coverage to follow by operation of law in the instant circumstances. Because *Pilkington* is directly on point in Ohio and without conflict under New York law, the law as established in *Pilkington* controls as to the insurance-coverage question regarding the post–1967 policies. Neither Ohio nor New York requires insurance coverage in the instant circumstances under an operation-of-law theory. There is no conflict between Ohio and New York law.

{¶ 29} Glidden III raises three "assignments of error" in its brief. Glidden III argues that (1) insurance coverage from the appellants arose by contract, (2) the appellants were collaterally estopped from raising any defense, and (3) the appellants waived or were equitably estopped from presenting the corporate-history defense. Appellants contend that a cross-appeal was required and that this court should ignore the presented assignments of error.

{¶ 30} R.C. 2505.22 permits the filing of assignments of error by an appellee who has not appealed. The statute states: "In connection with an appeal of a final order, judgment, or decree of a court, assignments of error may be filed by an appellee who does not appeal, which assignments shall be passed upon by a reviewing court before the final order, judgment, or decree is reversed in whole or in part."

{¶ 31} In *Parton v. Weilnau* (1959), 169 Ohio St. 145, 170–171, 8 O.O.2d 134, 158 N.E.2d 719, this court stated that assignments of error of an appellee who

has not appealed from a judgment may be considered by a reviewing court only to prevent "a reversal of the judgment under review."

{¶ 32} Further, "an assignment of error by an appellee, where such appellee has not filed any notice of appeal from the judgment of the lower court, may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment." Id.

{¶ 33} The trial court judgment entry determined the following: (1) collateral estoppel did not prevent contesting the issues in this case, (2) Glidden III was not entitled to any rights of insurance issued to SCM Corporation, and (3) Glidden III was not an insured under any of the policies in question. The opinion found, however, that there was no transfer of insurance benefits by contract and that no benefits passed by operation of law.

{¶ 34} The court of appeals issued a judgment entry that "reversed and remanded" the judgment of the trial court. However, the opinion in fact *affirmed* the holding of the trial court that there was no transfer of insurance benefits by contract and that the appellants were not collaterally estopped from raising the corporate-history defense. It held that the waiver argument was moot.

{¶ 35} The collateral-estoppel and waiver arguments are clearly the "shield" envisioned in *Parton*. Either argument, if successful, would reverse the holding that insurance coverage does not apply by operation of law, as the appellants would be unable to defend the summary judgment sought by Glidden III. And although we are considering the assignment of error arguing that the insurance benefits were assigned by contract, it is important to note that the question of whether the issue is properly before the court is a close one.

{¶ 36} Closely read, the trial court's opinion makes two separate judgments in determining that Glidden III is not entitled to coverage under the policies. The contractual-interpretation question requires a body of evidence and analysis different from the purely legal question of the operation-of-law issue. The court of appeals said so when it "overruled" the assignments of error put forth by Glidden III on this issue, implicitly affirming the judgment of the trial court on this basis. If the issue of insurance coverage constituted one entire judgment, then the court of appeals' discussion of contractual assignment must have been dicta.

{¶ 37} Ultimately, the appellants' argument that we should not address contractual assignment fails. The appellants' motion for partial summary judgment argued both that no assignment of insurance benefits existed and that no coverage arose by operation of law. However, the appellants sought judgment only that no insurance coverage existed, and they received it. Because the court

of appeals reversed that judgment, Glidden III may raise the issue of whether the benefits were contractually assigned.

{¶ 38} Glidden III's first assignment of error contends that the court of appeals erred in holding that Glidden III did not receive the rights to the insurance at issue pursuant to the 1986 corporate transactions. Glidden III claims that the 1986 side Letter Agreement between Hanson and ICI transferred the rights to recover under the policy. However, Hanson was not a named insured on any of the policies. The policies all named as insured SCM (NY) or the "Glidden–Durkee Division of SCM Corporation."

{¶ 39} The insurance policies were explicitly excluded as part of the SCM (NY) liquidation and distribution of assets to HSCM–6 prior to the sale of HSCM–6 to ICI. This makes the side Letter Agreement somewhat confusing: Hanson is agreeing to give to ICI "the benefit of any policy of insurance to the extent the same would provide cover for liability in respect of occurrences relating to the Business," but the insurance policies in question were not even *owned* by the corporate structure being sold. They remained in another Hanson wholly owned subsidiary, SCM (NY), which was not fully dissolved until later in 1986.

{¶ 40} The ultimate question is whether the side Letter Agreement requires SCM (NY) to transfer benefits that SCM (NY) retained under the policies in question. We begin the analysis by noting that parent and subsidiary corporations are separate and distinct legal entities, "even if the parent owns all the outstanding shares of the subsidiary." *Mut. Holding Co. v. Limbach* (1994), 71 Ohio St.3d 59, 60, 641 N.E.2d 1080.

{¶ 41} Absent specific authorization, a parent corporation may not bind a subsidiary. *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 450–451, 739 N.E.2d 338; *Whetstone Candy Co., Inc. v. Kraft Foods* (C.A.11, 2003), 351 F.3d 1067, 1075–1076. There is no evidence presented to establish that Hanson had the authority to bind SCM (NY), and the side Letter Agreement does not serve to do so.

{¶ 42} Assuming arguendo that the authority did exist, the plain language of the agreement prohibits it. Hanson itself promises to give to ICI the benefits of any policy of insurance. Hanson did not directly own the policies for which it attempts to convey the benefits. This attempt to totally disregard the corporate formalities is insufficient to establish a conveyance of SCM (NY)'s rights under the insurance policies.

{¶ 43} In its second assignment of error, Glidden III argues that a previous declaratory action in Ohio collaterally estops the appellants from tendering the defenses offered in the instant case. In the prior Ohio action, Glidden III received partial summary judgment ordering the insurers in the instant case to pay the defense costs incurred in connection with an underlying action pending in

federal court in Pennsylvania. The prior Ohio action concluded with a settlement and with the plaintiffs dismissing the action with prejudice.

{¶ 44} "The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." *Fort Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140; see, also, *Norwood v. McDonald* (1943), 142 Ohio St. 299, 27 O.O. 240, 52 N.E.2d 67, paragraph three of the syllabus. Essentially, collateral estoppel prevents parties from relitigating facts and issues that were fully litigated in a previous case. *State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 64, 765 N.E.2d 345.

{¶ 45} The question here is whether the previous facts and issues were "fully litigated," given that the case terminated with a dismissal by the plaintiffs. The issues must have been determined by a final appealable order. *State v. Williams* (1996), 76 Ohio St.3d 290, 294, 667 N.E.2d 932.

{¶ 46} In *Denham v. New Carlisle* (1999), 86 Ohio St.3d 594, 597, 716 N.E.2d 184, this court held that all prior interlocutory orders are dissolved after a dismissal, in that "a Civ.R. 41(A) dismissal nullifies the action only with respect to those parties dismissed from the suit." This analysis applies here. The summary judgment in the prior Ohio action never became a final order because the entire action was nullified with the settlement and dismissal. The doctrine of collateral estoppel cannot be invoked when there is no final order.

{¶ 47} Glidden III's third assignment of error simultaneously claims that the doctrines of waiver and equitable estoppel preclude the appellants from raising the corporate-history defense (the general argument that Glidden III's corporate history has caused any insurance coverage to become unenforceable). Although the court of appeals declared the error moot based on its resolution of the operation-of-law issue, in the interest of judicial economy, we hold that neither waiver nor equitable estoppel precludes the outcome in this case.

{¶ 48} The two doctrines are separate and distinct and therefore must be addressed separately. *Chubb v. Ohio Bur. of Workers' Comp.* (1998), 81 Ohio St.3d 275, 279, 690 N.E.2d 1267.

{¶ 49} Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional. *State ex rel. Wallace v. State Med. Bd. of Ohio* (2000), 89 Ohio St.3d 431, 435, 732 N.E.2d 960; *State ex rel. Athens Cty. Bd. of Commrs. v. Gallia, Jackson, Meigs, Vinton Joint Solid Waste Mgt. Dist.* (1996), 75 Ohio St.3d 611, 616, 665 N.E.2d 202.

{¶ 50} Glidden III suggests no evidence that the appellants voluntarily relinquished their right to assert a defense based on the corporate history of the parties, other than a failure to raise it during the course of dealings between the parties over the years preceding this litigation, including the prior Ohio action. As discussed, the prior Ohio action ended in a settlement. The settlement explicitly reserved the rights of the appellants to deny coverage should it be determined that coverage does not exist.

{¶ 51} These facts are intrinsically different from those in *Sanitary Commercial Servs., Inc. v. Shank* (1991), 57 Ohio St.3d 178, 182–183, 566 N.E.2d 1215, where as part of a settlement agreement, one party waived the right to appeal the outcome. There simply is no indication that the appellants voluntarily waived their rights to claim that no coverage exists as a result of the corporate history or for any other reason.

{¶ 52} Equitable estoppel precludes recovery when "one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.* (1994), 71 Ohio St.3d 26, 34, 641 N.E.2d 188. Generally, actual or constructive fraud is required. *State ex rel. Richard v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund* (1994), 69 Ohio St.3d 409, 414, 632 N.E.2d 1292.

{¶ 53} Glidden III suggests no actual or constructive fraud other than the alleged waiver, which we have found did not occur. Moreover, Glidden III provides nothing but general allegations that it claims to have relied to its detriment regarding the appellants' failure to raise the corporate-history defense. Equitable estoppel does not apply when there is no actual or constructive fraud and no detrimental reliance.

## Conclusion

{¶ 54} Glidden III is not entitled to coverage under any of the appellants' policies by operation of law or by contractual assignment. Further, collateral estoppel, waiver, and equitable estoppel do not apply to prevent the result in this case. Given the preceding, the judgment of the court of appeals is reversed, and the judgment of the trial court is reinstated in its entirety.

Judgment reversed.

MOYER, C.J., LUNDBERG STRATTON and O'DONNELL, JJ., concur.

LANZINGER, J., concurs in judgment only.

RESNICK and PFEIFER, JJ., dissent.

PFEIFER, J., dissenting.

{¶ 55} In *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121, we dealt with a case involving a short line of corporate succession where the original insured made a clear transfer of assets and liabilities to a successor entity. Here, the corporate history is more tangled. Even so, I would hold that the chose in action that arose at the time of the occurrence of the covered loss in this case was ultimately successfully transferred to Glidden III via the 1986 side Letter Agreement between Hanson and ICI. That Hanson, as the majority states, "did not directly own the policies for which it attempts to convey the benefits" is irrelevant. Hanson did own a chose in action—the right to the insurance benefits arising under the policy at the time of the loss—and was free to transfer it. Hanson successfully made that transfer through the side Letter Agreement, wherein it provided that ICI (and eventually Glidden III) would retain "the benefit of any policy of insurance to the extent the same would provide cover for liability in respect of occurrences relating to the Business prior to Closing giving rise to loss, injury, or damage thereafter subject to indemnity on costs." As in *Pilkington*, the chose in action, not an insurance policy, was transferred to the successor entity. Therefore, I would apply this court's holdings in *Pilkington*—as to Questions 1 and 2—to the facts of this case.

{¶ 56} Further, even if I agreed with the majority's conclusion that the benefits of the policy were not successfully transferred by contract in this case, I would hold that Glidden III acquired the benefits of the policy through operation of law.

{¶ 57} The idea that one twist within a tortuous corporate history could absolve an insurer from the duty to indemnify and defend on a claim that arose within the policy period is intolerable. The majority's holding today, that the entity that has assumed liability for past, covered acts does not receive any benefit of the insurance coverage related to that liability, has unacceptable implications for would-be insureds, for corporate succession in Ohio, and most important, for victims of tortious acts. This case demonstrates that a corporation that succeeds to liability for preacquisition operations of another entity should acquire the rights of insurance coverage by operation of law.

{¶ 58} This case involves potentially catastrophic losses that allegedly resulted from business activities for which the appellant insurers provided liability coverage. Glidden I paid premiums for that protection. The losses arose during the policy period. The losses were covered under the insurance contracts. Does the transfer of Glidden I's liabilities mean that the coverage never arose? Does the coverage simply vanish as if it had never existed because the policies themselves were not transferred to Glidden III? No. "[The] right to indemnity followed the liability rather than the policy itself. As a result, even though the parties did not assign [the] policy in the agreement, the right to indemnity under the policy

transferred to [the successor] by operation of law." *N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.* (C.A.9, 1992), 955 F.2d 1353, 1357. When the loss arises, the coverage implications become a part of the nature of the liability; the coverage is attached to the liability.

{¶ 59} The operation-of-law theory offers the simplest, cleanest solution to the problems concerning the effects of corporate restructuring on insurance policies and benefits. Only through recognition of the attachment of coverage to the liability can we have true predictability in corporate restructuring in Ohio. Only then can successor companies know with certainty that indemnity and defense costs will be transferred along with liabilities.

{¶ 60} Moreover, when coverage follows liability by operation of law, there is no risk that insurers will reap a windfall by denying coverage for covered losses based not upon the nature of the loss, but upon the postloss corporate maneuverings of the entity that paid for the coverage. Should a corporate structural change that negligibly affects an insurer's obligation be the basis for the complete abrogation of coverage?

{¶ 61} The disappearance of coverage affects more than corporate successors— it greatly affects the victims of tortious acts. Families that suffered injuries long before Glidden III ever existed will be punished for the manner in which Glidden III came into being. The original tortfeasor may have been reorganized into unrecognizability, but the injuries it caused remain. Despite what the original corporation looked like, whether or not the current incarnation has the resources to face responsibility, the fact is that insurers agreed to cover those very injuries for which the victims seek compensation.

{¶ 62} Whether the motives for restructuring include an attempt to avoid responsibility for historical acts or to assign liability where it cannot be effectively dealt with, this court should not allow restructuring to also free insurers from their primary responsibility of defending lawsuits and insuring the harm up to the policy limits. The recognition of the transfer of coverage by operation of law holds insurers to their agreement to cover losses, simplifies corporate restructuring, and provides available damages for injured parties. I would affirm the court's holding below.

RESNICK, J., concurs in the foregoing opinion.

———————

Anderson Kill & Olick, P.C., William G. Passannante, Cathleen Cinella Tylis, and Cort Malone; Goodman Weiss Miller, L.L.P., Drew A. Carson, and Sarah H. Kostura, for appellee.

Reminger & Reminger Co., L.P.A., and Holly Marie Wilson; Tressler, Soderstrom, Maloney & Priess, Judith Fournie Helms, and Todd S. Schenck, for appellants American Motorists Insurance Company and Lumbermens Mutual Casualty Company.

Tucker Ellis & West, L.L.P., and Kevin M. Young; Hogan & Hartson, L.L.P., William J. Bowman, and H. Christopher Bartolomucci, for appellant Hartford Accident & Indemnity Company.

Davis & Young, L.P.A., and David J. Fagnilli; Cohn Baughman & Martin, Brian A. Frankl, and James F. Martin, for appellant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.

Dennis J. Bartek; Lord, Bissell & Brook, L.L.P., John B. Haarlow, and Michael P. Comiskey, for appellants Certain Underwriters at Lloyd's, London, and London Market Insurance Companies.

Frantz Ward, L.L.P., Stephen F. Gladstone, and Travis F. Jackson; Wiley, Rein & Fielding, L.L.P., Laura A. Foggan, and John C. Yang, urging reversal for amicus curiae Complex Insurance Claims Litigation Association.

Anderson Kill & Olick (Illinois), P.C., Paul Walker–Bright, and Evan T. Knott; Taft, Stettinius & Hollister, L.L.P., and Timothy C. Sullivan, urging affirmance for amicus curiae M & M Metals International, Inc.